THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MARGARET AISLINN CHANNON,<br><br>    Defendant. | CASE NO. 2:20-mj-00336-MLP-JCC<br><br>ORDER |

This matter comes before the Court on the Government's motion (Dkt. No. 29) for review and revocation of the release order of the Honorable Brian A. Tsuchida, United States Magistrate Judge (Dkt. No. 26). Having considered the parties' briefing and the relevant record, the Court hereby DENIES the motion for the reasons explained herein.

I.    **BACKGROUND**

On May 25, 2020, Minneapolis police received a call that George Floyd, a 46-year old black man, had purchased cigarettes from a convenience store with a counterfeit $20 bill. Tim Arango *et al.*, *Footage of Police Body Cameras Offers Devastating Account of Floyd Killing*, N.Y. Times (July 15, 2020), https://www.nytimes.com/2020/07/15/us/george-floyd-video-killing.html. Police officers confronted Floyd and tried to convince him to sit down in a squad car. *Id.* Floyd asked the officers not to put him in the car, telling them that he had just recovered from COVID-19, was claustrophobic, and had anxiety. *Id.* The officers tried to force Floyd into

|   |   |
|---|---|
| 1 | the car anyways, and Floyd resisted their efforts. *Id.* During the struggle, the officers dragged |
| 2 | Floyd to the ground. *Id.* One of the officers, Derek Chauvin, placed his knee on Floyd's neck. *Id.* |
| 3 | Floyd told Officer Chauvin that he could not breathe. Officer Chauvin replied, "takes a heck of a |
| 4 | lot of oxygen to say that." *Id.* Slowly, Floyd's body began to go limp. *Id.* Onlookers shouted at |
| 5 | Officer Chauvin to remove his knee from Floyd's neck. Nicholas Bogel-Burroughs, *8 Minutes,* |
| 6 | *46 Seconds Became a Symbol in George Floyd's Death. The Exact Time Is Less Clear*, N.Y. |
| 7 | Times (June 18, 2020), https://www.nytimes.com/2020/06/18/us/george-floyd-timing.html. But |
| 8 | Officer Chauvin kept his knee where it was for at least eight minutes and 15 seconds—well after |
| 9 | Floyd had lost consciousness. *Id.* Floyd was later pronounced dead at a hospital. *Id.* |
| 10 |       Video of Floyd's fatal encounter with police sparked protests about police violence all |
| 11 | across the country. *See* Larry Buchanan *et al.*, *Black Lives Matter May Be the Largest Movement* |
| 12 | *in U.S. History*, N.Y. Times (July 3, 2020), |
| 13 | https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html. The |
| 14 | protests lasted for weeks and occurred in nearly 550 different places, from large cities like New |
| 15 | York to rural towns like Effingham, Illinois. *See id.* In total, an estimated 15 million to 26 |
| 16 | million people participated in the protests, making them potentially "the largest movement in the |
| 17 | country's history." *Id.* |
| 18 |       One of those protesters was allegedly Defendant Margaret Aislinn Channon. According |
| 19 | to the complaint, Channon appeared to protest peacefully in Seattle against police violence on |
| 20 | March 29, 2020. (Dkt. No. 1 at 11) (referencing a photo allegedly of Channon with her hands |
| 21 | raised in front of a police line). But the next day, Channon allegedly went to a protest in |
| 22 | downtown Seattle and engaged in several acts of vandalism. (*See id.* at 7–10.) First, Channon |
| 23 | purportedly set fire to a police vehicle using an aerosol can and a lighter. (*Id.* at 10.) After setting |
| 24 | fire to the vehicle, Channon allegedly went into a clothing store, damaged the store's interior, |
| 25 | stole a shirt, and threw merchandise onto the sidewalk for others to steal. (*Id.* at 9; Dkt. No. 29 at |
| 26 | 4–5.) Then, the Government claims, Channon used the aerosol can and lighter to set fire to four |

more police vehicles. (Dkt. No. 1 at 9–10.) And once that was over, Channon allegedly smashed the façade of a cell phone store and ransacked the interior of a sandwich shop. (*Id.* at 10; Dkt. No. 29 at 5.)

On June 10, 2020, Channon was arrested and charged with five counts of arson. (*Id.* at 1–3; Dkt. No. 13 at 1.) The next day, Channon made her initial appearance and stipulated to being detained pending trial. (Dkt. No. 11.) But on July 2, 2020, Channon moved to reopen her detention hearing and asked to be released pending trial. (Dkt. No. 18.) Pretrial Services recommended that Channon be released on certain conditions. (Dkt. No. 24 at 5–6.) Judge Tsuchida agreed that release was appropriate but concluded that additional conditions were needed to secure Channon's appearance at trial. (*See* Dkt. No. 33 at 41–42.) Accordingly, Judge Tsuchida ordered Channon released on those conditions. (*See* Dkt. No. 28 at 1–2.) The Government now asks the Court to review and revoke Judge Tsuchida's release order pursuant to 18 U.S.C. § 3145(a). (Dkt. No. 29.)

## II.    DISCUSSION

### A.    Standard of Review

When the Government appeals a magistrate judge's order releasing a defendant pending trial, the district court reviews the magistrate judge's decision *de novo*. *See United States v. Koenig*, 912 F.2d 1190, 1192–93 (9th Cir. 1990). In this context, *de novo* means that "the district court should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct with no deference." *Id.* The district court may also consider new evidence offered by the parties. *Id.*

### B.    Eligibility for Detention

A court may detain a defendant pending trial only if it determines that no "condition or combination of conditions will reasonably assure the appearance of [the defendant] . . . and the safety of any other person and the community." *See* 18 U.S.C. § 3142(f). Where, as here, there is probable cause to believe the defendant violated 18 U.S.C. § 844(i), there is a statutory

presumption that no conditions will reasonably assure the defendant's appearance or the community's safety.[1] *See* 18 U.S.C. §§ 844(i), 2332b, 3142(e)(3)(C). This statutory presumption serves two functions. *See United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). First, it shifts the burden of production to the defendant to produce some evidence that that they are neither a flight risk nor a danger to the community. *See id.* Second, if the defendant meets their burden of production, the presumption operates as a factor for the court to consider when assessing whether the defendant should be detained. *Id.* The presumption does not, however, shift the burden of persuasion; that burden remains on the Government. *Id.*

To meet its burden, the Government must demonstrate by a "clear preponderance" of the evidence that the defendant poses a risk of flight, *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991), and by "clear and convincing evidence" that the defendant is dangerous, *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1198 (9th Cir. 2019). In assessing the risk the defendant might flee and the danger the defendant might pose, the court must consider (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the defendant's personal characteristics and history; and (4) the seriousness of the danger the defendant may pose to the community upon release. 18 U.S.C. § 3142(g); *see also Diaz-Hernandez*, 943 F.3d at 1199 (explaining that the court must conduct an "individualized evaluation" based on statutory factors in 18 U.S.C. § 3142(g)).

        1.    <u>Risk of Flight</u>

There are reasons to fear that Channon might flee or fail to appear in court if she is

---

[1] Channon erroneously asserts that no rebuttable presumption applies here. (Dkt. No. 31 at 6.) Under 18 U.S.C. § 3142(e)(3)(C), a rebuttable presumption arises if "there is probable cause to believe that the person committed . . . an offense listed in [18 U.S.C. § 2332b(g)(5)(B)] for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 2332b(g)(5)(B), in turn, lists 18 U.S.C. § 844(i). Channon has been charged under 18 U.S.C. § 844(i) based on probable cause, (*see* Dkt. No. 1 at 1–16), and 18 U.S.C. § 844(i) proscribes a maximum term of imprisonment of 10 years or more. Thus, a rebuttable presumption applies in this case.

released. From 2016 to 2017, Channon failed to appear or was arrested for failing to appear six times. (Dkt. No. 24 at 5.) In addition, Channon has a significant incentive to flee from the current and contemplated charges against her, which come with five and 10-year mandatory minimum sentences. *See* 18 U.S.C. §§ 844(f)(1), (h)(1), (i); (Dkt. No. 23 at 9) (stating that the Government expects to present a charge under 18 U.S.C. § 844(h)(1) to the grand jury). Given Channon's prior failures to appear and her incentive to flee in this case, there is a risk that Channon will not appear if the Court releases her pending trial.

That said, a mere risk of flight does not warrant pretrial detention; there must be no conditions that "reasonably assure" the defendant's appearance. *See* 18 U.S.C. § 3142(e)(1); *United States v. Orta*, 760 F.2d 887, 889–90 (8th Cir. 1985) (explaining it is error to require a "guarantee" that the defendant will not flee). Pretrial Services proposed several conditions to assure Channon's appearance, (Dkt. No. 24 at 6), which Judge Tsuchida imposed with some additions, (Dkt. No. 28 at 1–2). Together, those conditions include the following:

- Requiring Channon to surrender all current and expired passports and travel documents;
- Restricting Channon's travel to the Western District of Washington;
- Requiring Channon to reside at the house of her mother, who will serve as Channon's third-party custodian;
- Requiring Channon to abide by a curfew; and
- Requiring Channon to participate in the location monitoring program with Active Global Positioning Satellite technology. (*Id.*)

Pretrial Services believes that these conditions will reasonably assure Channon's appearance. (Dkt. No. 24 at 5.) Judge Tsuchida agrees, and the Court does as well.

The Court's conclusion is bolstered by the help and support that many people have offered Channon. Those people include Channon's mother, who has agreed to supervise Channon and use her best efforts to assure Channon's appearance, (Dkt. No. 21 at 3); Channon's father and brother, who have said they will travel from Virginia to Seattle to support Channon,

(*id.* at 4); and Channon's employer, who has said that Channon will be welcomed back to work if she is released, (*see* Dkt. No. 31 at 6). In light of this support, the Court FINDS that there are conditions that would reasonably assure Channon's appearance.[2]

### 2. Danger to the Community

Channon is charged with a serious crime, and there is strong evidence that she committed that crime. (*See, e.g.*, Dkt. No. 29-1 at 1, 7–9.) However, to understand the precise danger Channon poses to the community, one must consider both the nature of Channon's alleged crime and the context in which it occurred. Channon is not charged with attacking a police officer or with physically harming anyone.[3] (Dkt. No. 1 at 1–3, 7–10.) Instead, Channon is charged with destroying property in what appears to have been an act of political protest during perhaps the largest outcry over police violence in history. (*See id.* at 7–11) (alleging that Channon protested peacefully the night before the arsons); Buchanan *et al.*, *supra*. Channon's alleged act of protest—an act that many engaged in around the country[4]—was illegal. It was also dangerous both physically and because it contributed to the type of tense, hostile atmosphere that is often a

---

[2] The support Channon has received belies the Government's suggestion that "Channon's only meaningful tie to the local community appears to be that her mother lives here." (Dkt. No. 23 at 8.) From the greater Seattle community alone, Channon has received the support of not only her mother and employer but also five other friends. (*See* Dkt. No. 21 at 5–6, 8–10.) Those individuals describe how Channon is "kind and selfless," has "showed [them] true friendship," and has offered "nothing but gentle kindness and compassion." (*See id.* at 5–6, 10.)

[3] The Government insinuates that Channon was planning to hurt a police officer because she searched for the officer's personal identifying information on the internet. (Dkt. No. 23 at 4–5.) Internet searches are not crimes, however, and the Government's insinuation does not amount to "clear and convincing" evidence that Channon is so dangerous that she must be deprived of her liberty and detained pending trial. *Diaz-Hernandez*, 943 F.3d at 1198.

[4] *See, e.g.*, Kaylee Remington, *Protestors Break Windows, Set Police Cars on Fire as George Floyd Demonstrations Turn Violent in Downtown Cleveland*, Cleveland.com (May 30, 2020), https://www.cleveland.com/crime/2020/05/protestors-break-windows-set-police-cars-on-fire-as-george-floyd-demonstrations-turn-violent-in-downtown-cleveland.html; Dakota Smith & Steve Saldivar, *LAPD Cars Set on Fire Near the Grove Amid Violent Clashes Between Police, Protesters in Fairfax District*, L.A. Times (May 30, 2020), https://www.latimes.com/california/story/2020-05-30/protesters-march-toward-beverly-hills-demanding-justice-for-george-floyd.

recipe for violent clashes between police and protesters. *See* Edward R. Maguire, *New Directions in Protest Policing*, 35 St. Louis U. Pub. L. Rev. 67, 91–96 (2015) (detailing how crowd and police dynamics can lead to violence during protests). But Channon's alleged act of protest does not show that she is so dangerous that she must be locked up *before* she is convicted.

Perhaps recognizing this, the Government tries to prove that Channon is dangerous by offering a scattershot of other accusations. (*See* Dkt. No. 29 at 6–12.) Many of those accusations are unsupported, irrelevant, or both. For example, the Government claims that Channon organized and participated in riots in Washington, D.C. on the day President Donald Trump was inaugurated. (Dkt. No. 29 at 9.) However, Channon was never charged in connection with any riots, the Government does not explain what those "riots" entailed, and the Government offers no specific evidence that Channon was involved in anything other than a political protest protected by the First Amendment. (*See id.*) Similarly, the Government alleges that Channon appears to have "issues with . . . marijuana consumption." (Dkt. No. 29 at 10.) But the Government never explains why the Court should detain a person pending trial for using drugs—never mind drugs that are legal in Washington State. (Dkt. No. 23 at 8.) Likewise, the Government references Channon's "serious mental health issues." (Dkt. No. 29 at 10.) Yet, those issues seem to be a reason to release Channon, not detain her, because she is more likely to get the treatment she needs if she is not locked in jail.[5] (*See* Dkt. No. 21 at 1) (letter from Channon's social worker outlining a treatment plan for Channon and advocating for her release); (*id.* at 5) (letter from a friend who promises to help Channon seek treatment if Channon is released).

---

[5] The Government asserts—without evidence—that Channon's mental health issues "may have been a contributing factor to Channon's violent rampage." (Dkt. No. 29 at 10.) The Government's assertion borders on offensive: the assumption that people with mental illness are inherently violent is wrong and contributes to the harmful stigma that they face. *See* Mohit Varshney *et al.*, *Violence and Mental Illness: What is the True Story*, 70 J. Epidemiol Cmty. Health 223, 223 (2016). Indeed, that stigma may explain why Channon never told her mother about the full extent of her mental health issues—a fact the Government baselessly claims makes Channon's mother an unfit third-party custodian. (*See* Dkt. No. 29 at 12.)

ORDER
2:20-MJ-00336-MLP-JCC
PAGE - 7

The Government also ignores how the conditions of Channon's release will help keep the community safe. Among other things, those conditions require Channon to reside at a specific residence, impose a curfew on her, and allow Pretrial Services to monitor her location 24/7. (Dkt. No. 28 at 1–2.) These conditions will make it incredibly difficult for Channon to engage in any dangerous acts of political protest.

Finally, the Government ignores how the many supportive people in Channon's life will help hold her accountable while she is released. Channon's mother will act as Channon's third-party custodian. (Dkt. No. 21 at 3.) Channon's father and brother will fly from Virginia to assist her. (*Id.* at 4.) One of Channon's close friends will visit Channon to "help facilitate a positive and encouraging environment" while Channon awaits trial. (*Id.* at 5.) And many others have offered to help Channon as well. (*See id.* at 7–10.) These offers of support leave the Court "reasonably assured" that the community will be safe if Channon is released. *See* 18 U.S.C. § 3142(e)(1). Accordingly, the Court FINDS that there are conditions of release that would reasonably assure the community's safety.

### 3. Conclusion

Channon's case is undoubtedly polarizing. Some may see Channon's alleged acts as a seriously misguided attempt to effect positive change; others may simply see them as dangerous and criminal. But the Court's present task is not to sit in judgment of Channon. Rather, the Court must decide only whether Channon should be released pending trial. In completing that task, the Court is guided by the essential principle that "[i]n our society liberty is the norm, and detention prior to trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). That exception is to be invoked "only for the strongest of reasons." *Sellers v. United States*, 89 S. Ct. 36, 38 (1969) (Black, J., in chambers). Those reasons are not present in this case because there are conditions of release that will reasonably assure Channon's appearance at trial and the community's safety. *See* 18 U.S.C. § 3142(e)(1).

### III. CONCLUSION

For the foregoing reasons, the Court DENIES the Government's motion (Dkt. No. 29) for review and revocation of Judge Tsuchida's release order (Dkt. No. 26). The Court ORDERS that Channon be released on the conditions set forth by Judge Tsuchida (Dkt. No. 28).

DATED this 20th day of July 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE